# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA M. FERREIRA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | Case No.  1:20-cv-00509-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF No. 29) |

## I.

## INTRODUCTION

Plaintiff Cecilia M. Carvalho[1] ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[2]  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The Court notes, at the hearing before the Administrative Law Judge, Plaintiff indicated that after filing her claim, she had divorced and changed her name from Ferreira back to her maiden name, Carvalho.  Plaintiff has been referred to by both names throughout the record, but the Court will refer to Plaintiff herein by her current surname.

[2]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been

## II.

## BACKGROUND[3]

### A.     Procedural History

On July 15, 2016, Plaintiff filed a Title II application for disability insurance benefits, alleging a period of disability beginning December 1, 2013.[4]  (Admin. Rec. ("AR") 15, 182–89, ECF No. 23-1.)  Plaintiff's claim was initially denied on December 15, 2016, and denied upon reconsideration on May 4, 2017.  (Id. at 110–15, 117–22.)  On June 18, 2018, Plaintiff appeared before Administrative Law Judge Daniel G. Heely (the "ALJ"), for an administrative hearing.  (Id. at 36–75.)  On October 3, 2018, the ALJ issued a decision finding that Plaintiff was not disabled because she could perform other jobs that existed in significant numbers in the national economy.  (Id. at 12–31.)  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Id. at 1–6.)

Plaintiff filed this action on April 8, 2020, and seeks judicial review of the denial of her application for disability benefits.  (ECF No. 1.)  On July 19, 2021, Plaintiff filed an opening brief.  (ECF No. 29.)  On August 16, 2021, Defendant filed a brief in opposition.  (ECF No. 30.)  On August 30, 2021, Plaintiff filed a reply.  (ECF No. 31.)

### B.     Summary of Evidence

1.     Relevant Medical Evidence

### a.     Steven Mills, M.D. (Jackson Rancheria Health Center)

Plaintiff was initially referred to Dr. Mills for fibromyalgia on May 21, 2013.  (AR 536–38.)  At that time, Plaintiff complained of pain throughout her body at a level of 5/10.  Dr. Mill's examination revealed Plaintiff appeared ambulatory and well, and demonstrated independent activities of daily living ("ADLs").  Dr. Mills saw Plaintiff approximately five months later for a

---

assigned to the undersigned magistrate judge for all purposes.  (ECF Nos. 13, 20, 21.)

[3] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

[4] In her initial application for disability insurance benefits, Plaintiff alleged her date of disability onset was January 1, 2008.  (AR 182.)  At the hearing before the ALJ, Plaintiff confirmed her amended alleged date of onset to December 1, 2013, which the Court refers to for purposes of its analysis herein.  (Id. at 15.)

medication refill.  (Id. at 533–35.)

Dr. Mills continued to treat Plaintiff throughout 2014 (a total of four visits).  On July 2, 2014, Plaintiff complained of hip pain.  (Id. at 528–29.)  On September 10, 2014, Plaintiff complained of foot pain and ankle swelling; she was diagnosed with bunions on her big toes and acute edema.  (Id. at 525–27.)  On December 3, 2014, Plaintiff complained of aching, burning, and dull pain due to her fibromyalgia, which was constantly fluctuating.  (Id. at 442–45.) Plaintiff complained of decreased mobility, joint tenderness, limping, nocturnal pain, spasms, fatigue, headaches, lightheadedness, back pain, bone/joint symptoms, joint tenderness, limping, muscle weakness, Myalgia, and neck stiffness.  She did not complain of gait disturbance, loss of consciousness, memory impairment, difficulty concentrating, feeling down, depressed or hopeless, or psychiatric symptoms.  Dr. Mills's exam revealed no swelling, and moderate distress, due to pain.  He noted everything else seemed normal and no further testing was required.  During each visit, Plaintiff was prescribed medications and sent home.  (See id. at 442–45, 525–32.)

Plaintiff was seen four times by Dr. Mills in 2015 and twice in 2016.  (Id. at 446–50, 451–66, 468–72.)  The majority of her visits were for prescription renewals.  (See id. at 446–50, 451–58, 463–66.)  On April 2, 2015, Plaintiff complained of depression and obesity.  (Id. at 446–50.) A general examination revealed Plaintiff was in moderate distress.  Dr. Mills opined Plaintiff's obesity was aggravated by a high fat diet, lack of exercise, her medications, and poor mobility. An exam on July 28, 2015, revealed agitation.  (Id. at 451–54.)

Around October 17, 2015, Plaintiff was in a motor vehicle accident.  (Id. at 473–77.) Related imaging completed revealed no fracture, dislocation, or subluxation in the pelvis; normal heart and clear lungs; no acute abnormality in a CT scan; and no indication of fracture, dislocation, or subluxation in the cervical spine.

On March 1, 2016, Plaintiff complained of weight gain and sought medication renewals. (Id. at 463–66.)  Her general exam yielded normal results.

On June 17, 2016, Plaintiff was examined in preparation for bariatric surgery.  (Id. at 468–72.)  On November 22, 2016, Plaintiff underwent bariatric surgery at the Dameron Hospital to surgically treat her morbid obesity.  (Id. at 508–21.)

### b.     Albert Ferrari, M.D. (Rheumatology)

Dr. Ferrari's progress notes indicate Dr. Ferrari treated Plaintiff on eight occasions over the three years between July 10, 2013, and May 9, 2016, including May 4, 2016, when Dr. Ferrari provided Plaintiff a medical source statement.  (Id. at 419–41.)

Plaintiff was first referred to Dr. Ferrari by Dr. Mills to evaluate her fibromyalgia on July 10, 2013.  (Id. at 429–37.)  During her intake appointment, Plaintiff indicated she saw a "Dr. Wu" for migraines and an unspecified psychiatrist.  Plaintiff changed medications in an attempt to avoid the side effect of weight gain, but with no change in weight.  Plaintiff complained of migraines and tension headaches 3–4 times per week, but denied any neck pain.  Plaintiff self-reported she was "limited a little" with respect to "vigorous activity" (i.e., running, lifting heavy objects, etc.), climbing stairs, bending, kneeling, stooping, and walking one block or one mile — she noted that, bending and any repetition activity caused soreness at pressure points.  Plaintiff also indicated she was "not limited at all" with respect to "moderate activity" (i.e., pushing a vacuum cleaner, playing golf, moving a table, etc.), carrying/lifting groceries, bathing or dressing herself, writing, feeding herself/using cutlery, or getting out of a chair or car.  Plaintiff additionally reported she does not exercise, she sleeps approximately 10 hours with one interruption and feels rested in the morning, but continues to have pain and some fatigue.  On examination, Dr. Ferrari noted Plaintiff was morbidly obese but in no distress, had tenderness in the neck, but excellent range of motion, showed slight generalized muscle tenderness in the abdomen, and tenderness in the back, radiating out to the hips, tested negative straight leg raising, showed a good range of motion, demonstrated grade-V muscle power in her extremities, had good peripheral pulses, and no edema.  Plaintiff showed no limitation of motion of her fingers bilaterally, and Plaintiff's range of motion in her wrists, elbows, shoulders, hips, ankles, and feet were all within normal limits.  Dr. Ferrari noted tenderness in the elbows, shoulders, hips, and knees, also hyperextensibility on the fingers and elbows.  Dr. Ferrari prescribed medications and recommended Plaintiff use a hot tub at morning, night, and during the day, and enroll in a water aerobics program.[5]

---

[5] There is no indication in the record that Plaintiff ever attempted these recommended treatments.

On September 26, 2013, and July 14, 2015, Plaintiff complained of headaches, fatigue, and joint/muscle pain.  (Id. at 426, 428.)  Dr. Ferrari's examinations yielded objective signs within "normal limits."  On October 1, 2013, April 7, 2016, and April 11, 2016, Plaintiff met with Dr. Ferrari because she wanted to discuss her medications.  (Id. at 424, 427.)

On March 23, 2016, Plaintiff saw Dr. Ferrari because she "want[ed] disability."  (Id. at 425.)  Dr. Ferrari recorded Plaintiff's subjective symptoms, which included joint pain, back pain, muscle pain, muscle weakness, and weight gain.  He noted objective exam symptoms were within normal limits, prescribed Plaintiff Tramadol and Cymbalta, and referred her for functional capacity tests.

In his medical source statement dated May 4, 2016, Dr. Ferrari provided the following opinions on a check-the-box form relating to his diagnosis of fibromyalgia based on examination and lab tests:

- Plaintiff experiences widespread body pain with multiple tender points; symptoms were expected to last at least twelve months;
- Plaintiff's symptoms included numbness and tingling, nonrestorative sleep, chronic fatigue, morning stiffness, frequent, severe headaches and depression; these symptoms were precipitated by stress, fatigue, and static movement; these symptoms were additionally affected by Plaintiff's psychological conditions of depression, memory deficits, decreased energy, sleep disturbance, and difficulty with concentration; Plaintiff's pain constantly interfered with her attention and concentration; and Plaintiff's medications (tramadol and gabapentin) caused drowsiness;
- Plaintiff's functional limitations included only being able to walk two city blocks without experiencing severe pain or needing rest; sit for one hour, stand for one hour, and walk for less than one hour in an eight-hour day;
- Plaintiff could frequently lift less than ten pounds, occasionally lift ten or twenty pounds, and never lift fifty pounds;
- Plaintiff could occasionally turn her head left, right, up, or down or hold her head in a static position; Plaintiff could rarely stoop, crouch or climb ladders and occasionally twist or climb stairs; Plaintiff could only occasionally handle or finger and rarely reach with her arms;
- Plaintiff needed to walk for a minute every hour and shift positions due to her pain; Plaintiff needed to take a break every hour in an eight-hour workday;
- Plaintiff would require to be absent about four days per month; and
- Plaintiff's limitations began in 1999.
- Also, Dr. Ferrari opined that Plaintiff was not a malingerer.

(Id. at 419–23.)

On May 9, 2016, Plaintiff cancelled an appointment previously scheduled with Dr. Ferrari for June 28, 2016, because the disability form was already completed.  (Id. at 424.)

///

5

### c.       BTE Technologies/St. Joseph's Medical Center

Plaintiff was tested at BTE Technologies/St. Joseph's Medical center on April 27, 2016, for a functional capacity evaluation, with the following results.  (Id. at 397–418.)  Lumbar spine range of motion left and right lateral flexions reached an average of 21 (normal = 25), with an extension average at 13 (normal = 25).  Several hand grip tests showed varying peak forces between 8.9 and 17.7 pounds.  Where coefficient of variation (COV) values greater than fifteen percent might be indicative of "submaximal effort," four of fourteen of Plaintiff's results produced COVs greater than fifteen percent.  Plaintiff completed the cart push test at 23.6 pounds.  Plaintiff completed the cart pull test at 21.7 pounds.

During the lift tests, Plaintiff was able to lift 40 pounds from waist to shoulder; 40 pounds from floor to waist; 30 pounds from floor to shoulder; and 30 pounds in the bilateral carry test.[6]

During the reach tests, Plaintiff rated "above competitive" on the standing horizontal reach test and "competitive" on the upper-level reach and the kneeling-to-standing-to-kneeling tests.  However, Plaintiff complained of back pain at a level of 8/10 when kneeling.  The examiner also noted Plaintiff appeared visibly fatigued after eight minutes, and that she had to stoop on multiple occasions to pick up dropped pegs.

### d.       Lauri Stenbeck, Psy.D. (Ewing Diagnostics & Psychological Services)

On November 17, 2016, Dr. Stenbeck performed a comprehensive mental status evaluation for purposes of establishing disability status.  (Id. at 493–98.)

Plaintiff claimed she has had schizophrenia since 2003.  She reported auditory hallucinations of voices that put her down and make fun of her; she also experiences paranoia, fearing that people are watching or following her; she gets nervous at work and worries that she will not meet expectations due to her condition; she also has difficulty with sleep.  Plaintiff claims her symptoms occur 3–4 times per week, and are moderately severe.  Compared to when the symptoms first began, the symptoms presently experienced are reportedly better and less

---

[6] The examiner notes after each test reasons why the test was terminated.  In addition to "safe lifting limit achieved," it was noted that the waist to shoulder lift was terminated because of "psychological reasons" in which Plaintiff complained of pain at a 7/10 to 8/10 level, and all other tests were terminated due to unspecified "psychological reasons."

persistent.  Plaintiff's current medication regimen helped decrease her paranoia and reduce the hallucinations from daily to several times a week.  Plaintiff reported attending counseling and was prescribed psychiatric medications, participated in therapy, and received medication management on and off since 2003.  Most recently she attempted therapy monthly for two years, but she stopped two months ago because she feels she no longer needs it.  She currently receives medication management (Zyprexa, Ambien, and Xanax) through her primary care physician.

Plaintiff reported feeling "good" and claimed her mental health symptoms did not impact daily living, except "the fear of being out in public, being watched or followed."  She reported psychosocial stressors are financial hardship and medical status.

Dr. Stenbeck confirmed Plaintiff had no prior psychiatric hospitalizations, no self-injurious or cutting behavior no history of being a danger to others, and Plaintiff denied current suicidal and homicidal ideation.  She has no family history of mental illness.  Her upbringing was normal; there were no developmental delays; and Plaintiff completed high school and three years of college.  Plaintiff drove herself to the evaluation appointment and arrived early.

Plaintiff reported she lives with her daughter in Valley Springs.  She also reported a steady work history: currently part time (15–25 hours per week) as a medical examiner for a life insurance company for the past two years; Plaintiff previously worked for eight years doing accounting and bookkeeping for the family construction/plumbing company.  Plaintiff also reported she had no significant problems in a work setting with coworkers or customers.  Plaintiff is able to manage funds independently and appropriately.  Her average day is spent working and completing housework.

Plaintiff reported she takes Cymbalta and Neurontin for her fibromyalgia.  She reported having significant difficulties with bending, lifting, or standing for long periods of time.  But Dr. Stenbeck noted Plaintiff "is independent for basic ADL's, and does not need help with preparing meals, or doing light household chores.  She noted she has trouble at times completing tasks at home due to fibromyalgia."

Upon examination, Dr. Stenbeck found Plaintiff's "adaptive functioning" for communication, self-care, home/living, social/interpersonal skills, use of community resources,

self-direction, and health and safety were all "adequate."  Dr. Stenbeck's mental status examination resulted with findings of good eye contact, intact intelligence, abstraction, judgment and insight, linear and logical thought process, good concentration, adequate memory and fund of knowledge, no motor activity or speech abnormalities, and was alert and fully oriented, but with impaired attention, limited calculations, and blunted affect.

Dr. Stenbeck concluded "from a psychological standpoint alone" that Plaintiff's mental health symptoms may be chronic in nature; that Plaintiff's symptoms are reduced with medication but still present; that Plaintiff's limitations in work and social functioning are mild to moderate; that she may have difficulty keeping up with a full-time work schedule, and would also likely have difficulty managing work-related stress and social interactions; and that Plaintiff would likely benefit from restarting therapy and continuing psychiatric medications to address and manage her current mental health symptoms.  "Overall the claimant's prognosis is fair."

Based on her assessment and diagnosis, Dr. Stenbeck opined Plaintiff's current work-related abilities are: (1) not significantly limited in performing simple and repetitive tasks; (2) moderately limited when performing detailed and complex tasks; (3) mildly limited in maintaining regular attendance in the workplace (though Plaintiff denied any current difficulties with work attendance at her part-time employment); (4) mildly limited in ability to perform work activities on a consistent basis; (5) not significantly limited with ability to perform work activities without special attention or additional supervision (due to currently being employed part-time in a largely independent position with no difficulty completing tasks independently); (6) moderately limited in ability to complete a normal workday or workweek within interruptions (due to having psychotic symptoms several times a week that may be exacerbated in a stressful work environment); (7) mildly limited in ability to accept instructions from supervisors (due to experiencing paranoia and worrying about her ability to complete work tasks, which may make her sensitive to negative feedback from supervisors); (8) moderately limited in ability to interact with coworkers and the public (due to paranoia and worries that others are out to get her); (9) moderately limited in ability to deal with the usual stresses encountered in a competitive work environment (due to mental health symptoms that increase the likelihood of ineffective coping

when stressed); and (10) capable of managing funds (as evidenced by report of appropriate financial management).

**e.      Jonathan Schwartz, M.D. (MDSI Physician Services)**

On November 17, 2016, Dr. Schwartz completed a comprehensive internal medicine evaluation of Plaintiff after reviewing a partial SSA disability report and physician progress note. (Id. at 501–05.)

Plaintiff complained of body pain and muscle pain ranging from 6/10 to 10/10 involving her entire body and especially the lower back, migraine headaches, and difficult sitting, bending, standing, and walking.  Plaintiff stated she received four injections in her lower back 1.5 years ago.  Plaintiff indicated she is able to dress herself, perform her own hygiene, drive, go shopping, and do household chores such as cooking, dishes, vacuuming, and mopping, with breaks. Plaintiff lives with her 20-year-old daughter.  During the general examination, Dr. Schwartz noted Plaintiff was in no acute distress, was able to walk into the room without assistance or difficulty, was able to transfer from a chair to the examination table, sat comfortably, there was no evidence of poor effort or inconsistencies, gait was normal, and Plaintiff needed no assistive device.  Dr. Schwartz tested Plaintiff's range of motion in her spine and joints and performed a straight leg raising test (negative).  Plaintiff tested 5/5 strength in upper and lower extremities bilaterally and 5/5 grip strength bilaterally.

Dr. Schwartz's findings included morbid obesity (5'2" and 261.5 pounds) and tenderness to palpation of 11 of the 18 fibromyalgia trigger points; he diagnosed Plaintiff with body pain, and determined he could not rule out fibromyalgia, muscle strain, degenerative joint disease, and degenerative disc disease.

Dr. Schwartz provided the following functional assessment/medical source statement: Plaintiff could stand/walk up to six hours; no limitations to sitting capacity; no assistive device; could lift 50 pounds occasionally and 25 pounds frequently; frequent stooping and crouching; and no limitations to manipulative activities or workplace environmental activities.

**f.      State Agency Psychiatrist, M. Balson, M.D.**

Dr. Balson reviewed Plaintiff's records as of November 23, 2016, and opined Plaintiff

9

suffered severe impairments of fibromyalgia (primary) and affective disorders (secondary) — that did not precisely satisfy the diagnostic criteria.  (Id. at 80–82, 85–87.)  Dr. Balson opined Plaintiff's affective disorder resulted in mild restriction of daily activities, and moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and did not result in any repeated episodes of decompensation.  Dr. Balson opined Plaintiff's ability to understand and remember detailed instructions was moderately limited, but her ability to remember locations, work-like procedures, and short and simple instructions was not significantly limited.

Factors weighing into Dr. Balson's conclusion were the findings that Plaintiff works successfully part-time, cares for her young daughter and herself, drives herself, manages her own money, and that Plaintiff appeared independent of all ADLs, a lack of any objective evidence to corroborate any diagnosis of schizophrenia, no history of hospitalization, Plaintiff's discontinued counseling, and the apparent effectiveness of medications.

Based on the totality of the evidence on file, Dr. Balson concluded that Plaintiff was capable of maintaining the full-time basic skill work in an open marketplace (within a workplace which does not demand intensive-extensive interaction with the public): Plaintiff would be able to perform at least simple, repetitive tasks over an eight-hour day, on a full-time (40 hours per week) basis, with limited interaction with the public/coworkers/supervisors, and that Plaintiff would be able to adapt to work stressors.

g.      **State Agency Physician, Sharon Amon, M.D.**

Dr. Amon reviewed Plaintiff's records and allegations of fibromyalgia and schizophrenia as of December 2, 2016, and concluded Plaintiff was "not disabled," finding that Plaintiff could adjust to other work.  (Id. at 81, 83–85, 87–89.)  Dr. Amon ultimately opined Plaintiff was capable of doing light, unskilled RFC work, based on the seven strength factors indicated in Plaintiff's records and her impairments.  Dr. Amon concluded Plaintiff has some exertional limitations: Plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds; Plaintiff could frequently lift and/or carry (including upward pulling) 10 pounds; Plaintiff could stand and/or walk about six hours in an eight-hour day and sit about six hours in an eight-hour

workday; Plaintiff had an unlimited capacity to push and/or pull (within lift/carry parameters); and Plaintiff did not have any postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations.   This conclusion was based on Dr. Amon's findings that Plaintiff's evidence of ADLs and adequate treatment through medication cut against Plaintiff's subjective symptoms.

### h.      Edmund Yao, M.D.

The medical records indicate Plaintiff had two appointments with Dr. Yao.  On November 28, 2017, Plaintiff was evaluated as a new patient by Dr. Yao.  (Id. at 540–41.)  Dr. Yao's general exam yielded generally unremarkable findings with no acute distress, no clubbing, and no edema in extremities.   On April 19, 2018, Plaintiff made an appointment with Dr. Yao to request disability paperwork.  (Id. at 542.)  Dr. Yao referred Plaintiff back to Dr. Ferrari.

### i.      State Agency Physician, H. Pham, M.D.

At the reconsideration level with respect to the medical portion of the disability determination, Dr. Pham considered Plaintiff's medical records as of April 26, 2017, and found Plaintiff had medically determinable impairments: fibromyalgia and affective disorders.  (Id. at 95–97, 99–101, 104–05.)   Dr. Pham gave the following RFC assessment: Plaintiff could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds, and unlimited capacity to push/pull within these parameters; stand/walk about six hours in an eight-hour day and sit about six hours in an eight-hour day; Plaintiff could occasionally climb ramps/stairs; frequently stoop, kneel, crouch, or crawl; never climb ladders/ropes/scaffolds, and could balance unlimitedly.  Dr. Pham opined Plaintiff's postural limitations appeared to be based on her morbid obesity only.  Finally, Dr. Pham found Plaintiff did not have any manipulative, visual, communicative, or environmental limitations.  Based on the seven strength factors of the physical RFC, Dr. Pham found Plaintiff was capable of medium work, and was not disabled.

Dr. Pham indicates he reached this conclusion due to the minimal medical records provided — notably, only one rheumatology "OV" (from July 2013) — Plaintiff's minimal interaction with her primary care physician in 2016, and the fact that Plaintiff appears to have sought very minimal treatment.  Further, Dr. Pham appears to suggest Plaintiff's symptoms

derived largely from her morbid obesity, which would likely become alleviated in light of the fact that Plaintiff recently completed gastric bypass surgery without complications.

### j.    State Agency Psychologist, Jonathan Brandon, Ph.D.

Also on reconsideration, Dr. Brandon reviewed Plaintiff's records as of May 3, 2017, and completed the psychiatric review technique (PRT) for Plaintiff with respect to her allegations of (1) schizophrenia and (2) depressive, bipolar, and related disorders.  (Id. at 97–98, 101–03.)

Dr. Brandon noted there had been no change in Plaintiff's medical condition since the initial filing, and that the newer records showed Plaintiff continued to use psychotropic medications, including olanzapine, which helped decrease her paranoia to the point that she no longer feels she needs therapy.  On this record, Dr. Brandon determined there was insufficient evidence to substantiate the presence of a schizophrenia disorder, agreed with the initial finding giving moderate limitations, and affirmed the initial decision by Dr. Balson.

Based on these findings, the mental residual functional capacity assessment ("MRFC") indicated Plaintiff was able to perform at least simple, repetitive tasks and sustain them over an eight-hour day, forty hours per week, adapt to work stressors, and required limited interaction with the public/coworkers/supervisors.

### 2.    Relevant Non-Medical Evidence

### a.    Plaintiff's Allegations and Hearing Testimony[7]

Plaintiff alleges she suffers from fibromyalgia and schizophrenia.  (Id. at 298.)  At the time of her initial application, Plaintiff was 5'2" and weighed 260 pounds.[8]  Plaintiff alleges these conditions cause her pain and other symptoms.  Plaintiff's alleged disability onset date was December 1, 2013.  (Id. at 41.)

///

///

///

---

[7] Since the allegations in Plaintiff's disability application form and her June 18, 2018 hearing testimony before the ALJ largely overlap and, at times, are identical, the Court shall combine its review of those records herein, noting relevant inconsistencies in testimony.

[8] Following her gastric bypass surgery in 2016, Plaintiff more recently reported she weighs 160 pounds.

i.      Work History[9]

Plaintiff completed three years of college as of 2005, which included a phlebotomy program in 2014.  (Id. at 299.)

Prior to 2005/2006, Plaintiff worked as a preschool teacher for Gavilan College, and Goldsmith Seeds.  (Id. at 59.)  As a preschool teacher, Plaintiff warmed up children's lunches.  (Id. at 60.)  Plaintiff worked as a preschool teacher until she began working at Ferreira Plumbing.

Plaintiff was self-employed as part-owner, with her then-husband, of Ferreira Plumbing, Inc. from approximately November 2006 until sometime in 2013, when the company filed for bankruptcy.[10]  (Id. at 43–44.)  At Ferreira Plumbing, Plaintiff reportedly sat at a computer eight to ten hours per day, using QuickBooks to balance the books, completing payroll, accounts receivable, and accounts payable, signing contracts, typing, mailing, xeroxing, taking phone calls, and supervising other people.  (Id. at 60, 309.)  Plaintiff frequently lifted 25 pounds.

From January 2015 through January 2017, Plaintiff worked forty to forty-five hours per week as a medical examiner for Delta Exams and IMS.[11]  (Id. at 45–47; see also id. at 208, 228–29 (Plaintiff's 2015 tax return lists her occupation as "medical aide"); id. at 248–49, 261–64, 268–69, 294 (Plaintiff's 1099 forms for 2015 and 2016).)  At IMS, Plaintiff's typical duties included drawing blood, asking the patient questions, dropping samples off, and driving 4–8 hours a day during an eight-hour shift.  (Id. at 47–48, 307.)  Plaintiff would carry a bag with a scale, paperwork, blood pressure machine, needle kit, blood kits and other supplies, gloves, etc.  Plaintiff estimated in a typical workday, she spent eight hours walking, standing, and handle/grab/grasping big objects; five hours sitting; four to six hours reaching, writing/typing or handling small objects; three hours crouching; and one hour climbing stairs and kneeling.

---

[9] Some of Plaintiff's testimony appears to be inconsistent with her work records, which indicate possible gaps in employment in 2014, 2015, and 2016.  (See id. at 193, 198–99.)  Plaintiff's supplemental work records indicate she worked at Ferreira Plumbing from November 2006 through September 2016.  (Id. at 377.)

[10] Plaintiff's work records also indicate she worked for the Calaveras County School District from 2010–2012.  (AR 192–93; see also id. at 209–10 (Plaintiff's 2014 tax return indicates income from occupation as "Medical Examinar" and husband's occupation as "plumbing estimator").)

[11] Plaintiff's supplemental work records indicate she worked for IMS and "Exam One" from January 2015 through September 2016.  (AR 377.)  Plaintiff states she left IMS because of the long hours in her vehicle, which caused increased widespread pain, headaches, and hearing voices.

Plaintiff estimated the heaviest weight she could lift was 20 pounds,[12] and that she frequently lifted items weighing 10 pounds.  Plaintiff described her work at Delta Exams to be substantially the same with respect to job duties and time spent on activities.  (Id. at 308.)  At the time of Plaintiff's application, she was working, but her work activity changed on October 17, 2015, due to her condition.  (Id. at 301.)

From June 2017 to January 2018, Plaintiff worked approximately twenty-four hours per week at The Resource Connection of Amador as a preschool assistant.[13]  (Id. at 41–42; see also id. at 201–02, 204.)  Plaintiff assisted the teacher with lesson plans, picked up and changed children, and attended to their needs, picks up cots for sleeping, boxes, and bikes to put away.  (Id. at 42, 377.)

Plaintiff did not do any work from January 2018 to March 2018.  (Id. at 43.)  Plaintiff stopped working because her symptoms (such as numbness in her face, pain throughout her lower back, difficulty being in public) became worse.  (Id. at 58–59.)   Plaintiff began receiving state disability benefits in March 2018.  (Id. at 43.)

     ii.    <u>Medical</u>[14]

Plaintiff was diagnosed with fibromyalgia in 1997.  (Id. at 49.)  She had two carpal tunnel surgeries (one on each hand), and no longer has problems with either hand.  In October 2016, Plaintiff had gastric bypass surgery; in November 2016, she had a bowel obstruction, sepsis, and pneumonia, for which Plaintiff was hospitalized for two months.  Plaintiff currently has no problems resulting from the pneumonia or bypass surgery.  (Id. at 49–50.)  Plaintiff also testified she had arthroscopic knee surgery on the left knee twice, and a hysterectomy.   (Id. at 50.)  Plaintiff has had cortisone injections in her neck and lower back.   (Id. at 64.)   Plaintiff's

---

[12] At the hearing, Plaintiff testified that she lifted, at most, fifteen pounds.  (AR 48.)

[13] In her supplemental work records, Plaintiff indicates her employment with the Resource Connection lasted from July 30, 2017, through January 2, 2018.  (AR 377.)

[14] In her February 16, 2017 disability report appeal form, Plaintiff indicated that her physical and mental medical conditions had not changed, nor had she developed any new medical conditions, since the submission of her initial application.  (AR 350–56.)  But Plaintiff indicated her mobility had changed due to her fibromyalgia.  On her May 23, 2017 disability report appeal form, Plaintiff indicated her medical conditions changed as of May 1, 2017: Plaintiff's medication pertaining to her mental illness was increased and Plaintiff's activities had changed due to concentration issues attributed to fibromyalgia/Syzorina systems "flare up[s]."  (Id. at 359–65.)

medications include: Ambien and Zanax for sleep; Cymbalta, Neurontin, and Tramadol for pain; Imitrex for headaches; Lasix for water retention; Oxybutin for bladder control; and Zyprexa for Schizophrenia.  (Id. at 301.)

Plaintiff testified that she was diagnosed with paranoia schizophrenia and has been taking prescription medications and/or attending counseling or therapy since 2002.  (Id. at 51.)  Plaintiff testified the side effects she experienced from her medications included weight gain and loss of concentration.  She has tried changing her medications with her doctors.  Plaintiff has used a "CBC oil" in the morning for approximately two months to help with her anxiety.  (Id. at 52.)

Plaintiff testified that her paranoia/schizophrenia makes it hard to be in public.  (Id. at 58.)  Plaintiff testified that she hears voices when she is under stress, when she doesn't sleep, and when she has migraines.  (Id. at 63.)  Plaintiff testified that her fibromyalgia and schizophrenia would trip off a migraine.  (Id. at 64.)  Plaintiff testified that her treating physicians, Dr. Mills and Dr. Yao, both told her that stress aggravates her fibromyalgia and schizophrenia, increasing Plaintiff's pain level throughout her body and causing headaches, burning, and numbness of face.  (Id. at 378.)  Plaintiff testified that she "live[s] on Excedrin Migraine . . . Imitrex," and that there was an entire month in which she had a migraine every day, but the Imitrex did not provide any relief.  (Id. at 64–65.)  When Plaintiff gets a migraine, she uses a heating pad on her neck, lies down in a dark room, gets nauseated, and sometimes vomits.  (Id. at 65–66.)  After increasing her migraine medication, Plaintiff reported having migraines six to seven times a month.  (Id. at 66.)

iii.    Activities

Plaintiff currently lives with her significant other.  (Id. at 52.)  Plaintiff's significant other helps around the house by doing yardwork and taking out the garbage.

Plaintiff indicated she would work at her job four days out of the week, and complete housework the remainder of the week.  (Id. at 321.)  Plaintiff described her housekeeping as a job as well, noting her daily duties at home included standing, cleaning, and bending.  (Id. at 310.)  Throughout the day, Plaintiff watches TV when she takes breaks in-between doing housework.  (Id. at 53–54.)  Plaintiff watches TV approximately four hours per day.  Plaintiff estimated that she typically spent eight to twelve hours in a day walking and standing; three hours sitting and

reaching; and two hours stooping, crouching, handling/grabbing/grasping big objects and writing/typing/handling small objects. (Id. at 310.)  Plaintiff also claims her conditions limit her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and concentrate. (Id. at 325.) And Plaintiff claims she can only walk 30 steps before needing to rest for ten minutes. (Id. at 325.)  Plaintiff alleges it was very hard to work and do household duties because she experienced severe low back pain. (Id. at 319.)  After folding clothes, her arms and shoulders hurt.  Driving and sitting for long periods resulted in pain in her back, lower back, hips, and pressure points. When she is in pain, Plaintiff claims her concentration is off and it takes her a long time to complete tasks. (Id. at 325.)

At the hearing, Plaintiff testified that she can complete light house work — such as microwaving, folding laundry, and putting away items at home — but that it is a hardship for her. (Id. at 53.)  Plaintiff testified that repetitive activities — such as folding laundry or keyboarding — aggravate her symptoms. (Id. at 53, 60–61.)  Plaintiff uses her cell phone for calls and texting; she uses her computer and iPad to go online to pay her bills and check her bank balance, and can count change, handle a savings account, and use a checkbook on her own. (Id. at 54, 61, 323.) This has not changed since her condition began. (Id. at 323.)  However, Plaintiff testified she is limited to using her computer for about half an hour because her hands hurt after that, and she loses her concentration and hears voices. (Id. at 61, 63.)  Plaintiff opined she would not be able to work an eight-hour day in which she would be required to use her hands throughout the day, even if it was not constantly, but only on and off. (Id. at 61.)

Plaintiff cares for her daughter — which includes cooking and doing laundry — but the meals are "not as detailed as they used to be" and take approximately an hour to prepare. (Id. at 321–22.)  Plaintiff also feeds, bathes, and cares for three dogs and two cats. (Id. at 321.)  Plaintiff reported she does not require any special reminders to take care of personal needs, grooming, or take her medications. (Id. at 322.)  Plaintiff goes outside every day. (Id. at 323.)  Plaintiff enjoys reading, watching tv, and talking on the phone. (Id. at 324.)  Plaintiff is able to spend a day running errands[15] — such as picking up medications at the pharmacy (ten minutes away),

---

[15] Plaintiff testified that she typically drives about two days per week running errands.

16

groceries from the grocery store (a forty-five-minute drive each way), household items, and taking the pets to the vet and groomers as needed, and visiting her doctors — but Plaintiff claims at the end of the day, she has achy soreness in her arms and is in a lot of pain.  (Id. at 53, 57–58, 323.)  Plaintiff and her significant other take turns driving for Plaintiff's monthly visit to her mother in San Jose, CA.[16]  (Id. at 53.)  Plaintiff and her significant other also go out to eat.

### b.      Letter from Plaintiff's Mother, Helia Carvallo

Plaintiff's mother, Helia Carvallo, who lives in San Jose, California, submitted a letter dated October 30, 2016, to supplement her third-party function report in support of Plaintiff's application for benefits.  (Id. at 334–43.)

Ms. Carvallo states Plaintiff had a difficult pregnancy with her twins in 1996 and was thereafter (dates unknown) diagnosed with fibromyalgia.   Plaintiff was treated for her fibromyalgia by Dr. Papillon, a rheumatologist in Gilroy.  In 2002, Plaintiff started hearing voices that put her down and believed people were talking about her, watching her, and were out to get her.  Plaintiff was diagnosed with schizophrenia by Dr. Alec Clerk, a psychiatrist in San Jose.[17]  Thereafter, the medications Plaintiff was prescribed caused her to put on an enormous amount of weight gain.

Ms. Carvallo states she would sometimes visit Plaintiff to help her with cleaning, yardwork, and laundry.  (Id. at 336.)  Her activities with Plaintiff are minimal about 60% of the time, due to Plaintiff's pain.  Much of Ms. Carvallo's description of Plaintiff's symptoms mirrors Plaintiff's allegations.  Additionally, contrary to Plaintiff's reports, Ms. Carvallo states Plaintiff requires and receives assistance from her daughter and Ms. Carvallo to take medications, prepare meals, do housework, or drive anywhere.  Ms. Carvallo states Plaintiff cannot do anything or go

---

[16] Plaintiff testified at the hearing that she has not taken any "long trips more than about 100 miles away from [her] home either in California or outside of California." (AR 54.)  As Plaintiff's address appears to be in Valley Springs, California (id. at 76), this testimony does appear to conflict with the assertion that Plaintiff regularly visits her mother in San Jose, California (a distance of approximately 108 miles each way).

[17] The Court notes the administrative record contains no mention or medical records relating to either a Dr. Clerk or Dr. Papillon, and Plaintiff did not testify about these doctors at any time with respect to this claim.  It appears the name "Dr. Alex Clerk" was initially written in on Plaintiff's supplemental medical treatment form identifying physicians who treated Plaintiff subsequent to May 23, 2017; however, the name is crossed out and no further information was provided.  (See AR 378.)

1  anywhere alone because she is fearful of the voices she hears, and Plaintiff calls Ms. Carvallo ten

2  to twelve times a day for reassurances.

3        **c.**      **Vocational Expert**

4        Cathleen Spencer, a vocational expert ("VE"), also testified at the June 18, 2018 hearing.

5  The VE characterized Plaintiff's work to be "teacher's aide II; 249.367-074; SVP 3; DOT at

6  light," and "nurse, licensed practical . . . per the DOT." (AR 67–68.)

7        The ALJ proffered a hypothetical of an individual of the same age and similar educational

8  background and work history as Plaintiff that could perform sedentary work except that, in an

9  eight-hour workday, she would be limited to lifting or carrying ten pounds occasionally; sitting

10  four hours; standing or walking two hours total; could never climb, balance, stoop, kneel, crouch,

11  or crawl; could never perform jobs requiring even simple workplace judgment; could never work

12  in close proximity to others without becoming distracted from work tasks; and would require

13  unscheduled rest breaks in addition to regular breaks, causing the employee to be away from the

14  workstation and off task twenty-percent of the workday.  (Id. at 68–69.)

15        The VE opined that this individual could not perform any full-time competitive jobs.  (Id.

16  at 69.)

17        The ALJ proffered a second hypothetical in which the individual could perform light work

18  except that she would be limited to work that is SVP 1 or 2 or could be learned on the job in one

19  month or less and would not exceed reasoning level 2 (i.e., "unskilled type of work"); could

20  tolerate a low level of work pressure, defined as work with no multitasking or detailed job tasks;

21  could work at a consistent pace throughout the workday, but not at a production-rate pace (i.e.,

22  where each task must be performed within a strict time deadline, such as meeting a quick

23  turnaround with no tolerance for discrepancies); could tolerate occasional interaction with

24  coworkers and the public, and could respond appropriately to criticism from supervisors; could

25  occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but could never work

26  around hazards (such as moving, dangerous machinery or unprotected heights), and could never

27  climb ladders, ropes, or scaffolds.  (Id.)

28        The VE opined that this person could not perform any of Plaintiff's previous work.  (Id. at

70.)   However, the VE opined that this person could perform other light-level, unskilled jobs, such as: retail marker (light SVP 2), 209.587-034, for which there are 305,000 jobs in the nation; routing clerk (light SVP 2), 222.587-038, for which there are 53,000 jobs in the nation; and cleaner housekeeping (light SVP 2), 323.687-014, for which there are 133,000 jobs in the nation. (AR 70.)

On examination by Plaintiff's counsel, the VE testified that the national jobs numbers came from "Job Browser Pro," a service which draws its numbers from the Bureau of Labor Statistics ("BLS").  (AR 70–71.)

When presented with variations on the ALJ's second hypothetical, the VE testified that, where the person was working as a marker, even if she was not given "a hard and fast [production rate] number by the supervisor or employer," it might be possible, depending on the employer and products being marked, that the employer would have "a proverbial eye test" to evaluate the "quantum of work the person's done that day,"  (Id. at 72.)  The VE also testified that, during the training period of a job, it was possible that the hypothetical person would need to interact with coworkers and supervisors "more than occasionally."  (Id. at 72–73.)  The VE also confirmed that, if the hypothetical person were so sensitive to criticism that they couldn't effectively hear and learn the underlying tasks and couldn't get through the initial training period, then the person would not be able to eventually perform the job, even if it falls within the SVP 1 or 2 criteria.  (Id. at 73.)   Finally, Plaintiff's counsel modified the hypothetical person to include a lack of concentration due to physical pain and auditory hallucinations, resulting in that person not performing their tasks correctly or not performing them at all for fifteen percent of the workday. The VE testified that such a person would not be performing in the aforementioned jobs at competitive levels.

**C.     The ALJ's Findings of Fact and Conclusions of Law**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018.

- Plaintiff has not engaged in substantial gainful activity since December 1, 2013, the

alleged onset date.

- Plaintiff has the following severe impairments: fibromyalgia, affective disorders, psychotic disorder, migraine headaches, and obesity.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, or 404.1526.

- Plaintiff has the RFC to perform light work as defined in 20 CFR § 404.1567(b), except that Plaintiff is able to do unskilled work that is SVP 1 or 2 or could be learned on the job in one month or less and would not exceed reasoning level 2. She is able to tolerate a low level of work pressure, defined as work with no multi-tasking or detailed job tasks, is able to work at a consistent pace throughout the workday but not at a production rate pace where each task must be performed within a strict time deadline with no tolerance for discrepancies. She is able to tolerate occasional interaction with co-workers and respond appropriately to criticism from supervisors and tolerate occasional interaction with the public. She is able to occasionally climb ramps, stairs, balance, stoop, knee, crouch, or crawl, but never climb ladders, ropes, or scaffolds, or work around hazards such as moving dangerous machinery or unprotected heights.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff is defined as a younger individual age 18–49, as of the amended alleged disability onset date, but subsequently changed age category to closely approaching advanced age.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from December 1, 2013, through the date of decision on October 3, 2018.

(AR 12–31.)

# III.

# LEGAL STANDARD

## A.     The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[18] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).   The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled.   20 C.F.R. § 404.1520;[19] Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).   The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is

---

[18] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[19] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. §§ 416.901 et seq. The regulations are generally the same for both types of benefits.  Therefore, further references are to the disability insurance benefits regulations, 20 C.F.R. §§ 404.1501 et seq.

on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A claimant establishes a *prima facie* case of qualifying disability once he has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's residual functional capacity ("RFC").  20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given his or her RFC, age, education, and work experience.  20 C.F.R. § 416.912(g); Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006).  To do this, the ALJ can use either the Medical Vocational Guidelines ("grids"), or call a vocational expert ("VE").  See 20 C.F.R. § 404 Subpt. P, App. 2; Lounsbury, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  "Throughout the five-step evaluation, the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.' "  Ford, 950 F.3d at 1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

**B.     Standard of Review**

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised by

the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Further, the Court's review of the Commissioner's decision is a limited one; the Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C. 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).  "[T]he threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154.  Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard."  Thomas v. CalPortland Co., 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless.  Stout, 454 F.3d at 1055–56.  Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination."  Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  Ford, 950 F.3d at 1154 (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

# IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred by: (1) improperly evaluating the medical opinion evidence, (2) improperly rejecting Plaintiff's testimony, (3) improperly rejecting Plaintiff's lay witness testimony, and (4) issuing a Step-Five finding that was not supported by substantial

1   evidence.  (ECF No. 29.)  The Court addresses each argument in turn.

2        **A.        Whether the ALJ Properly Evaluated the Medical Opinion Evidence**

3            Plaintiff contends the ALJ failed to provide "clear and convincing" reasons for according

4   "reduced weight" to Dr. Ferrari's opinion and failing to accord "proper" weight to Dr. Stenbeck's

5   opinion.  (ECF No. 29-1 at 13–17; ECF No. 31 at 5–8.)  She does not raise any issue with respect

6   to the ALJ's evaluation of the other doctor's opinions.  See Indep. Towers of Wash. v. Wash., 350

7   F.3d 925, 929 (9th Cir. 2003) (stating court "will not consider any claims that were not actually

8   argued in appellant's opening brief" and will only "review . . . issues which are argued

9   specifically and distinctly in a party's opening brief.").

10           When evaluating applications filed before March 27, 2017, the ALJ must explain the

11  weight he gives to all medical source opinions.  See 20 C.F.R. § 404.1527(c).  There are three

12  types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who

13  examine but do not treat the claimant (examining physicians); and (3) those who neither examine

14  nor treat the claimant [but who review the claimant's file] (nonexamining [or reviewing]

15  physicians)."  Holohan v. Massanari, 246 F.3d 1195, 1201–02 (9th Cir. 2001) (citations omitted).

16  Generally, a treating physician's opinion carries more weight than an examining physician's

17  opinion, and an examining physician's opinion carries more weight than a reviewing physician's

18  opinion.  Id.  However, a non-examining opinion may nonetheless constitute substantial evidence

19  if it is consistent with other independent evidence in the record.  See Thomas, 278 F.3d at 957;

20  Orn v. Astrue, 495 F.3d 625, 632–33 (9th Cir. 2007).

21           If a treating or examining physician's opinion is uncontradicted, the ALJ may reject it

22  only by offering "clear and convincing reasons that are supported by substantial evidence."

23  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  Conversely, "[i]f a treating or

24  examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it

25  by providing specific and legitimate reasons that are supported by substantial evidence."  Id.

26  (citing Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir. 1995)).  Similarly, where a treating or

27  examining doctor's opinion is contradicted by medical evidence, the ALJ may reject it by

28  providing specific and legitimate reasons supported by substantial evidence in the record.  See

<u>Andrews</u>, 53 F.3d at 1041.  The ALJ can satisfy the "specific and legitimate" burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)).  Finally, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings."  <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1228 (9th Cir. 2009) (quotation and citation omitted).

       1.   <u>Dr. Ferrari</u>

Plaintiff first contends the ALJ improperly accorded "reduced weight" to Dr. Ferrari (a treating physician)'s opinion because he failed to provide "clear and convincing" or "specific and legitimate" reasons for doing so.  Furthermore, to the extent the ALJ discounted Dr. Ferrari's opinion based on Plaintiff's ability to perform ADLs, Plaintiff argues this was an improper basis to accord the opinion reduced weight.  (ECF No. 29-1 at 13–16; ECF No. 31 at 5–7.)  These arguments are unsupported in the record and legal authorities.

       **a.**      **Consideration of Evidence of Activities of Daily Living in the Record**

As an initial matter, the Court addresses Plaintiff's argument that the ALJ cannot rely on reports of Plaintiff's ADLs as a basis for according reduced weight to Dr. Ferrari's opinion. Plaintiff relies heavily on the Ninth Circuit Case <u>Benecke v. Barnhart</u>, 379 F.3d 587 (9th Cir. 2004), for the premise that it was improper for the ALJ to rely on evidence of Plaintiff's ADLs to assign reduced weight to Dr. Ferrari's opinion.  In <u>Benecke</u>, the ALJ concluded from the record that the claimant suffered from both fibromyalgia and somatization disorder,[20] discredited Benecke's testimony about the extent of her impairments as well as Benecke's treating physicians' opinions, and determined Benecke could perform light or sedentary work based on the ADLs she testified to (i.e., being able to attend school, drive, and do errands).  <u>Id.</u> at 591–93. The Ninth Circuit held the ALJ erred in discounting Benecke's credibility and the evaluations of her treating physicians where the ALJ relied largely on Benecke's ADLs to the exclusion of other

---

[20] Somatization disorder is a condition in which a patient's perceived physical problems are of psychological origin. <u>Id.</u> at 592.

1   medical evidence, because "the mere fact that a plaintiff has carried on certain daily activities . . .

2   does not in any way detract from her credibility as to her overall disability." Id. at 594.  Plaintiff

3   argues the Court should, as in Benecke, reject the ALJ's findings as erroneous where the ALJ

4   assigned reduced weight to Dr. Ferrari's opinion because of Plaintiff's ADLs.

5        However, in Benecke, the Ninth Circuit noted the ALJ discounted Benecke's testimony

6   not only due to her ADLs, but also due to his unsupported disbelief of Benecke's symptom

7   testimony as well as his misunderstanding of fibromyalgia, which the court noted was "poorly-

8   understood within much of the medical community" in the early 2000's. Id. at 589–90.  In the

9   instant case, by contrast, none of Plaintiff's treating, consulting or reviewing physicians, nor the

10   ALJ, appear to harbor the same misunderstandings or misconceptions of fibromyalgia as was

11   evident in Benecke nearly twenty years ago.  Further, Benecke is distinguishable from the instant

12   case because the ALJ did not rely "largely" on the existence of ADLs, but also identified and

13   discussed in great detail Plaintiff's own testimony and symptom reports, multiple examinations

14   that included reports of generally unremarkable findings, and the doctors' findings based on their

15   direct observations of Plaintiff which also conflicted with Dr. Ferrari's opinion and Plaintiff's

16   subjective testimony.  Also distinguishable between the two cases are the medical records, which

17   were voluminous and contained several concurring medical opinions that supported Benecke's

18   symptoms and only one conflicting opinion that Benecke's symptoms were psychosomatic,

19   compared to Plaintiff's scant number of appointments with treating physicians and essentially the

20   opposite composition of medical opinions.  With respect to the ADLs themselves, Benecke is

21   again distinguishable: in Benecke, the plaintiff testified she could only take one class at a time

22   and only with special accommodations, could only drive five miles before experiencing severe

23   pain, took daily naps due to her fatigue, and spent most of her waking time sitting in a recliner

24   because her pain increased whenever she did anything else; whereas here, Plaintiff testified she

25   often drives up to an hour each way to run errands and would drive from Valley Springs to the

26   Bay Area (a drive of nearly three hours each way) twice a month to visit her mother, prepared

27   meals for herself and her daughter, did housework, cared for five pets, and other activities without

28   assistance.  In sum, the Court finds Plaintiff's reliance on Benecke is unavailing and Plaintiff's

reported activities constitute substantial evidence in the record that is properly considered by the ALJ in his evaluation of the medical opinions.  See Ford, 950 F.3d at 1155 ("A conflict between a treating physician's opinion and a claimant's activity level is a specific and legitimate reason for rejecting the opinion.").

### b.    Specific and Legitimate Reasons to Discount Dr. Ferrari's Opinion

The ALJ assigned "reduced weight" to the check-the-box form[21] Dr. Ferrari provided for his medical source statement opinion, finding it unpersuasive because the opinion was "not completely supported by the overall record or by [Plaintiff's] own report of her daily activities." (AR 28.)  That is, the ALJ considered not only Plaintiff's own reports and testimony which contradicted Dr. Ferrari's opinion, but also the opinions and prior administrative medical findings in the record from six different doctors who supported a non-disability conclusion.  (Id. 20–28.) Because Dr. Ferrari's opinion was contradicted by the opinions of other physicians (treating, examining, and non-treating), the ALJ was required to give only "specific and legitimate" reasons for rejecting the opinion.  Andrews, 53 F.3d at 1041; see also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (a non-treating physician's opinion may also serve as a "legitimate reason for rejecting a treating or examining physician's opinion . . . when it is consistent with other independent evidence in the record.").  The ALJ did so, and his reasons were supported by substantial evidence.

More specifically, the ALJ noted Dr. Ferrari opined multiple functional limitations in his May 4, 2016 medical source statement form, including that Plaintiff could only occasionally turn her head left, right, up, or down or hold her head in a static position; rarely stoop, crouch, or climb ladders, and occasionally twist or climb stairs; only occasionally handle or finger and rarely reach with her arms; frequently lift less than ten pounds, occasionally lift ten or twenty pounds, and never lift fifty pounds.  (AR 27–28 (citing id. 419–23).)  Dr. Ferrari also opined Plaintiff's

---

[21] The Court notes Defendant's arguments in favor of discounting Dr. Ferrari's opinion are punctuated by the fact that Dr. Ferrari's assessment consisted of a "check-the-box" form.  While an opinion cannot be rejected merely for being expressed as answers to a check-the-box questionnaire, Popa v. Berryhill, 872 F.3d 901, 907 (9th Cir. 2017), the Ninth Circuit has nevertheless held "the ALJ may permissibly reject check-off reports that do not contain any explanation of the bases of their conclusions."  Ford, 950 F.3d at 1155 (citations omitted).  Relatedly, the Ninth Circuit has also provided that an ALJ may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted.  Tommasetti, 533 F.3d at 1041.

experience of pain or other symptoms were constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks throughout an eight-hour workday; that Plaintiff was only able to walk two city blocks without experiencing severe pain or needing rest; sit for one hour, stand for one hour, and walk for less than one hour in an eight-hour day; that Plaintiff needed to walk for a minute every hour and shift positions due to her pain; Plaintiff needed to take a break every hour in an eight-hour workday; and that Plaintiff would require to be absent about four days per month.  (Id.)  But these findings conflict with Dr. Ferrari's own treatment notes, Plaintiff's testimony and reports, and the other medical evidence in the record.

For example, while Plaintiff gave varying reports of pain at different points and throughout her body over the course of her treatment, the progress reports consistently showed normal balance, normal gait, normal coordination, and were generally unremarkable.  (See, e.g., id. at 444, 448, 453, 457.)  Dr. Ferrari's progress notes also showed Plaintiff had tenderness in her neck but excellent range of motion; negative straight leg raising; good back range of motion; decreased range of motion of the bilateral fingers, but no synovitis, swelling, or inflammation; grade-V muscle power of the extremities; no extremity edema; good fist formation and adequate grip strength; and range of motion of the wrists, elbows, shoulders, hips, ankles, and feet within normal limits.  (Id. at 424–41.)  Plaintiff reported to Dr. Ferrari in July 2013 she was "limited a little" with respect to "vigorous activity" (i.e., running, lifting heavy objects, etc.), but that she was "not limited at all" with respect to "moderate activity" (i.e., pushing a vacuum cleaner, moving a table, etc.), carrying/lifting groceries, bathing or dressing herself, writing, feeding herself/using cutlery, or getting out of a chair or car.  (Id. at 432–37.)  Plaintiff also reported to Dr. Ferrari that she worked as a bookkeeper for the past six years, twenty-five to thirty hours per week.  (Id. at 429–31.)  Dr. Ferrari's progress notes from July 2015 indicate examination results including normal memory, normal attention, concentration, gait, and balance.  (Id. at 424–41.)  In June 2016, Plaintiff denied focal weakness, gait disturbance, headache, incoordination, memory impairment, and difficulty with concentration.  (Id. at 469.)  These inconsistent findings in Dr. Ferrari's progress reports constitute "specific and legitimate" reasons for discounting his ultimate opinion on Plaintiff's limitations.  Tommasetti, 533 F.3d at 1041 (incongruity between treating

physician's opinion and medical records constitutes a specific and legitimate reason for rejecting opinion of the patient's limitations).

Similarly, the functional capacity evaluation Plaintiff completed April 27, 2016 — a mere seven days prior to issuance of Dr. Ferrari's opinion — demonstrated Plaintiff's capacity to lift 40 pounds from waist to shoulder, 40 pounds from floor to waist, 30 pounds from floor to shoulder, and 30 pounds in the bilateral carry test; Plaintiff performed stair climbing testing with a reciprocal pattern, without complaints; and she scored in the above-competitive range in upper level reach occasional, and in the competitive range in kneeling to standing to kneeling with complaints of back pain.  (AR 397–418.)  These findings, which directly contradict Dr. Ferrari's opinion also constitute "specific and legitimate" reasons.  See Tonapetyan, 242 F.3d at 1149 (opinion from examining source constitutes substantial evidence because it rests on an independent examination of the claimant).

Plaintiff also reported to Dr. Stenbeck that she currently (November 2016) worked part-time as a medical examiner, that work was "steady"; and that Plaintiff had no significant problems in a work setting with coworkers or customers.  (AR 493–98.)  Dr. Stenbeck opined Plaintiff was not significantly limited in performing simple and repetitive tasks and only moderately limited when performing detailed and complex tasks, based on her observations of, among other things, Plaintiff's good concentration, adequate memory and fund of knowledge, no motor activity or speech abnormalities, and general appearance during the evaluation.  Similarly, Plaintiff reported to Dr. Schwartz (November 2016) that she dressed herself, performed her own hygiene, household chores such as cooking, washing dishes, vacuuming, and mopping, shopped, drove, and worked part-time.  (Id. at 501–07.)  Dr. Schwartz observed that Plaintiff was pleasant, cooperative, able to walk without assistance or difficulty, able to transfer from a chair to the examination table, sat comfortably, and displayed no evidence of poor effort or inconsistencies.  Dr. Schwartz's general examination findings also indicated Plaintiff had a supple neck without adenopathy, normal chest excursions and clear to auscultation, regular heart rate and rhythm and normal S1, S2, no extremity cyanosis, clubbing or edema, normal gain, no assistive device, negative straight leg raising, normal muscle bulk and tone, 5/5 strength, 5/5 grip strength, intact

sensation, range of motion generally within normal limits, intact cranial nerves, and tenderness to eleven of eighteen fibromyalgia trigger points.  (Id. at 24 (citing AR 594).)  In December 2014, Plaintiff also complained to Dr. Mills of decreased mobility and tenderness but did not complain of gait disturbance, memory impairment, or difficulty concentrating.  (Id. at 442–45.)  Each of these findings in the medical records, which conflict with Dr. Ferrari's opinion on Plaintiff's movement and concentration limitations, were also identified and considered by the ALJ (Id. at 21–27) and constitute specific and legitimate reasons to discount Dr. Ferrari's opinion. Tonapetyan, 242 F.3d at 1149.

Further, with respect to Plaintiff's own reports, the ALJ noted Plaintiff used a computer (AR 19 (citing AR 443)); she cared for her daughter and three dogs and two cats (id. at 19 (citing AR 321)); she performed household chores, such as cooking and laundry (id. at 19 (citing AR 321–22)); and she drove (i.e., would sit for periods of time) to appointments, to the main store (approximately forty-five minutes to an hour away), to visit her mother in the bay area, to pick up prescriptions, groceries and household items, and to the vet and groomers for her pets (id. at 19 (citing AR 323)).  These findings, too, conflict with Dr. Ferrari's opinion regarding Plaintiff's limitations, and constitute specific and legitimate reasons for the ALJ's according reduced weight to Dr. Ferrari's opinion.  Ford, 950 F.3d at 1155 ("A conflict between a treating physician's opinion and a claimant's activity level is a specific and legitimate reason for rejecting the opinion."); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (affirming ALJ's rejection of treating source opinion of disabling limitations where the claimant could perform activities including taking care of minor children).

On this record, the Court concludes the ALJ provided specific and legitimate reasons for according reduced weight to Dr. Ferrari's opinion that were supported by substantial evidence in the record.  Bayliss, 427 F.3d at 1216; Lester, 81 F.3d at 830–31; Andrews, 53 F.3d at 1041.

### 2.   Dr. Stenbeck

Plaintiff argues the ALJ did not accord "proper" weight to examining psychologist Dr. Stenbeck's opinion and should have fully and fairly developed the record by recontacting Dr. Stenbeck with respect to her opinion indicating that Plaintiff may have difficulty keeping up with

1  a full-time work schedule.  (ECF No. 29-1 at 13–17; ECF No. 31 at 5–8.)  The Court disagrees.

2         Contrary to Plaintiff's suggestions, the ALJ assigned "significant weight" to Dr.

3  Stenbeck's opinion that Plaintiff's limitations in work and social functioning are mild to

4  moderate, including the findings that Plaintiff was not significantly limited in performing simple

5  and repetitive tasks; was moderately limited when performing detailed and complex tasks; was

6  mildly limited in maintaining regular attendance in the workplace (even though Plaintiff denied

7  any current difficulties with work attendance at her part-time employment); was moderately

8  limited in the ability to complete a normal workday or workweek; was mildly limited in the

9  ability to perform work activities on a consistent basis (due to problems observed with attention);

10  and that she may have difficulty keeping up with a fulltime work schedule.  (AR 27 (citing AR

11  493–500).)  The ALJ noted Dr. Stenbeck's opinion was persuasive because it was generally

12  consistent with her own findings and observations on examination, and it was supported with an

13  explanation.  Dr. Stenbeck's opinion was also consistent with the medical findings by Drs. Balson

14  and Brandon.  On this record, the Court finds the ALJ accorded proper weight to Dr. Stenbeck's

15  opinion and will not disturb it.

16         Plaintiff's contention that the ALJ should have recontacted Dr. Stenbeck with respect to

17  her opinion is also unavailing.  Plaintiff argues the portion of Dr. Stenbeck's opinion indicating

18  that Plaintiff "may have difficulty keeping up with a full-time work schedule" was ambiguous

19  and the ALJ had a duty to develop the record further before rejecting Dr. Ferrari's opinion that

20  Plaintiff "was likely to be absent from work four days per month" due to her impairments.

21  Plaintiff maintains that, if the ALJ had obtained further specificity from Dr. Stenbeck as to how

22  often each month Plaintiff would be expected to be absent because of her impairments, and if Dr.

23  Stenbeck's assessment was consistent with Dr. Ferrari's, then the ALJ shouldn't have discounted

24  Dr. Ferrari's opinion on this limitation.  As an initial matter, it does not appear to the Court that

25  the ALJ outright rejected Dr. Ferrari's opinion with respect to Plaintiff's likely absences from

26  work, as Plaintiff contends.  As noted, the ALJ determined Plaintiff suffered from severe physical

27  impairments, was unable to perform her past work, and was mildly limited in maintaining

28  workplace attendance, among other mild and moderate limitations.  The Court also disagrees with

1    Plaintiff's argument as follows.

2         "The ALJ always has a 'special duty to fully and fairly develop the record and to assure

3    that the claimant's interests are considered.' " Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir.

4    2003) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).  However, "[a]n ALJ's

5    duty to develop the record further is triggered only when there is ambiguous evidence or when the

6    record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276

7    F.3d 453, 459–60 (9th Cir. 2001); Bayliss, 427 F.3d at 1217 (citing 20 C.F.R. §§ 404.1512(e),

8    416.912(e)); see also Brown v. Berryhill, 697 F. App'x 548, 549 (9th Cir. 2017) ("Because the

9    record evidence was not ambiguous and the record was sufficient to allow for proper evaluation

10   of the evidence, the ALJ was not required to re-contact Brown's doctors or further develop the

11   record . . . [and] the ALJ provided specific, clear and convincing reasons for finding Brown's

12   testimony regarding his symptom severity was not fully credible, including that Brown's

13   testimony was inconsistent with his daily activities.").

14        Neither of the aforementioned circumstances appears here.  Rather, the Court finds the

15   record was adequate to enable the ALJ to evaluate the evidence concerning the severity of

16   Plaintiff's symptoms. See, e.g., Agatucci v. Berryhill, 721 F. App'x 614, 618 (9th Cir. 2017).

17   Furthermore, "[w]here the evidence is susceptible to more than one rational interpretation, it is

18   the ALJ's conclusion that must be upheld." Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d

19   595, 599 (9th Cir. 1999).  Accordingly, the ALJ did not have a duty to recontact Dr. Stenbeck and

20   the Court will not disturb the ALJ's decision with respect to his evaluation of the medical opinion

21   evidence.

22        **B.      Whether the ALJ Properly Discounted Plaintiff's Symptom Allegations**

23        The ALJ is responsible for determining credibility,[22] resolving conflicts in medical

24   testimony and resolving ambiguities. Andrews, 53 F.3d at 1039.  A claimant's statements of pain

25   or other symptoms are not conclusive evidence of a physical or mental impairment or disability.

26   _____

27   [22] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016.
     Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an
     examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform

28   work-related activities." S.S.R. 16-3p at 1-2.

42 U.S.C. § 423(d)(5)(A); S.S.R. 16-3p; see also Orn, 495 F.3d at 635 ("An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.").

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  Garrison, 759 F.3d at 1014; Smolen, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted).  "This requires the ALJ to specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines that testimony."  Id. (citations and internal quotations omitted).

Subjective pain testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  Burch, 400 F.3d at 680–81; Rollins, 261 F.3d at 857; S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).  The ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  S.S.R. 16-3p at 5.  Additional factors an ALJ may consider include the location, duration, and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; conflicts between the claimant's testimony and the claimant's conduct — such as daily activities, work record, or an unexplained failure to pursue or follow treatment — as well as ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal contradictions in the claimant's statements and testimony, and other testimony by the claimant that appears less than candid.  See Ghanim v.

1 | Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); Tommasetti, 533 F.3d at 1039; Lingenfelter v.

2 | Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); Smolen, 80 F.3d at 1284.

3    As previously noted, the ALJ concluded the medically acceptable evidence supported the

4 | finding that Plaintiff has severe impairments of fibromyalgia, affective disorders, psychotic

5 | disorder, migraine headaches, and obesity.  (AR 12–31.)  Further, the ALJ found the evidence

6 | supported a finding that Plaintiff's medically determinable impairments could reasonably be

7 | expected to cause the alleged symptoms; However, the ALJ determined that Plaintiff's statements

8 | concerning the intensity, persistence, and limiting effects of such symptoms were not entirely

9 | consistent with the medical evidence and other evidence in the record.  (Id. at 22.)

10    Plaintiff argues the ALJ only generally cited to the medical evidence as contradicting

11 | Plaintiff's alleged limitations, but failed to identify any particular findings inconsistent with any

12 | of the specific functional deficits Plaintiff described or specify which testimony he found not

13 | credible.   (ECF No. 29-1 at 18–19.)   Focusing largely on her alleged symptoms due to

14 | fibromyalgia, Plaintiff argues the ALJ failed to address her testimony[23] that she has difficulty

15 | using her hands for activities such as writing, typing, or using a computer; has to take breaks in

16 | between tasks while doing housework; folding laundry precipitates pain; that the meals she

17 | prepares are "not as detailed as they used to be"; she requires assistance with house and yard

18 | work; after shopping, she is in a lot of pain; and she relies on her significant other to take care of

19 | the yard work and take out the garbage.  (Id. at 19–20.)  Instead, Plaintiff argues the ALJ only

20 | considered an incomplete and inaccurate recital of Plaintiff's ADLs to support discounting her

21 | pain testimony.  (Id. at 20.)  This assertion is contradicted by the record.

22    Importantly, the Court does not find that that ALJ cherry-picked Plaintiff's testimony

23 | about her ADLs to fully discount her testimony; indeed, the ALJ found that Plaintiff has

24 | medically determinable impairments with mild to moderate limitations.  However, to the extent

25 | Plaintiff's own testimony and self-reports are internally inconsistent or contradict her allegations,

26 | the ALJ properly pointed it out and considered it when he discounted Plaintiff's pain testimony.

---

27

28 | [23] Some of the testimony Plaintiff cites to in support of this argument was actually given by Plaintiff's mother.  With respect to determining whether the ALJ improperly discounted *Plaintiff's* pain testimony, the Court focuses on those allegations.

Ghanim, 763 F.3d at 1163; Tommasetti, 533 F.3d at 1039.  With respect to Plaintiff's testimony and self-reporting, for example, the ALJ found it relevant that Plaintiff testified that she cared for her daughter, performed household chores such as cooking, laundry, washing dishes, vacuuming, mopping, shopping and driving, prepared simple meals for herself and her daughter daily, and cared for three dogs and two cats.  (AR 19 (citing AR 321); Id. at 24 (citing AR 494–95, 501–02)); see also Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) ("if, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working."); Rollins, 261 F.3d at 857 (affirming ALJ's reliance on objective evidence, including ADLs, in rejecting claims of disabling pain from fibromyalgia).  The ALJ also pointed to Plaintiff's own testimony that she did not have problems with personal care and did not need assistance with activities.  (AR 19 (citing AR 321); Id. at 24–25 (citing AR 494–95).)  The ALJ also considered Plaintiff's work history, noting Plaintiff not only reported to medical providers that she worked 15–20 hours per week, but Plaintiff clarified during the June 18, 2018 hearing that she really worked at least forty hours per week.  (Id. at 17 (citing AR 248–49, 294); see also id. at 45–47, 56, 208, 228–29.)  Based on this internally inconsistent testimony, the ALJ reasonably discounted Plaintiff's allegations of disability symptoms.

In addition to Plaintiff's own testimony, the ALJ pointed out the objective medical records which conflicted with Plaintiff's pain testimony.  Consideration of objective medical records is also appropriate when evaluating symptom allegations.  Burch, 400 F.3d at 680–81; Rollins, 261 F.3d at 857.  For example, during the limited number of medical visits Plaintiff had, even where she complained of pain, the ALJ noted the progress notes from Plaintiff's treating providers often included examination findings that were generally unremarkable.  (AR 22–23 (citing AR 430, 425–26, 444, 448, 453, 457, 461, 465, 470, 526, 529, 538)); see also Burch, 400 F.3d at 681 (objective showing that claimant's pain "was not severe enough to motivate her" to seek treatment for about three or four months was "powerful evidence" regarding the extent to which she was in pain).  The ALJ also noted normal imaging studies of Plaintiff's hips, pelvis, shoulder,

chest, cervical spine, and head (AR 25 (citing AR 473–77).)  The ALJ also reviewed the results from Plaintiff's functional capacity evaluation on April 27, 2016.  The ALJ noted this exam yielded results showing a decreased lumbar spine range of motion, but also that Plaintiff could lift forty pounds in waist to shoulder occasional and floor to waist occasional work simulation testing; she could lift thirty pounds in floor to shoulder occasional work simulation testing; she could carry thirty pounds in bilateral carry work simulation testing; she performed stair climbing testing with a reciprocal pattern (without complaints), all "on a safe and dependable basis"; and she scored in the above competitive range in standing horizontal reach occasional, in the competitive range in upper level reach occasional, and in the competitive range in kneeling to standing to kneeling (with complaints of 8/10 back pain and using the bilateral upper extremities for support) in work simulation testing.  (Id. at 23 (citing AR 397–418).)  And the ALJ deemed it relevant that Plaintiff's examining doctors, Drs. Schwartz and Stenbeck, also observed that Plaintiff was able to walk without assistance or difficultly, was well groomed, was able to transfer from a chair to the examination table, sat comfortably, and displayed no abnormal motor activity.  (Id. at 24 (citing AR 493, 504).)

With respect to Plaintiff's impairments arising from her mental status, the only argument Plaintiff appears to assert is that the ALJ improperly discounted her testimony that she suffered from migraines multiple times per week which affected her ability to focus and concentrate.  (ECF No. 29-1 at 21.)  This Court does not find this argument supported by the record.

The ALJ determined the evidence

> did not demonstrate Plaintiff's migraines caused significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements of gait and station or significant interference with speech, vision, mental function, or daily activities.  Nor did it show an alteration of awareness of loss of consciousness and transient postictal manifestation of unconventional behavior or significant interference with activity during the day.

(AR 18–19.)  In addition to the aforementioned citations to the medical record, the ALJ cited Plaintiff's own report that she did not need reminders to take care of personal needs and grooming or to take medication, that she could drive, use a computer, and that she denied

problems with memory — which directly contradicted memory allegations — as well as Plaintiff's reports that she was able to go out alone; that she shopped in stores; she spent time with others; and she got along with others, finding this evidence was in contrast to Plaintiff's allegations that her migraines were so severe that she could not function or concentrate.  (Id. at 19 (citing AR 322–25, 443, 502, 540).)  The ALJ also cited to the records showing Dr. Mills found, at times, that Plaintiff's memory was normal; that Dr. Stenbeck's evaluation of Plaintiff resulting in findings that Plaintiff's memory was adequate based on the word-memory exercise; and that Plaintiff reported feeling "good," and claimed her mental health symptoms did not impact daily living, except "the fear of being out in public, being watched or followed."  (Id. (citing AR 444, 453, 494, 496).)

The ALJ also contrasted Plaintiff's treatment with her symptom allegations.  See Fair, 885 F.2d at 603 (an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment may be considered by the ALJ in discounting symptom allegations).  Notably, the ALJ found "there is no evidence of a medically documented history of a schizophrenia spectrum and other psychotic disorders or of a depressive, bipolar or related disorder of at least two years' duration with evidence of ongoing medical treatment, mental health therapy, psychosocial support(s), or highly structured setting(s). . . ."  (AR 20.)  For example, Plaintiff had no prior psychiatric hospitalizations, no self-injurious or cutting behavior no history of being a danger to others, and Plaintiff denied current suicidal and homicidal ideation.  (Id. at 494.)  Plaintiff reported her medications helped decrease symptoms.  (Id. at 493–94); see Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted).  Plaintiff also reported that, after participating in therapy on and off since 2003, she stopped therapy because she felt she no longer needed it.  (AR 24 (citing (AR 493–94)); see also Burch, 400 F.3d at 681 ("The ALJ is permitted to consider lack of treatment in his  credibility  determination.");  Molina  v.  Astrue,  674  F.3d  1104,  1114  (9th  Cir.  2012),

superseded by regulation on other grounds (claimant's failure to assert a good reason for not seeking treatment can cast doubt on the sincerity of the claimant's pain testimony, as can a failure to seek psychiatric treatment until after the claimant applies for disability benefits).  Additionally, the ALJ appears to take note that, despite alleging she has suffered limiting effects of fibromyalgia since 1997, she was only referred for an evaluation for fibromyalgia on May 21, 2013.  (AR 22 (citing AR 536).)

On this record, the Court finds the ALJ made specific citations to the administrative record that demonstrate clear and convincing reasons in support of his evaluation of Plaintiff's pain testimony.  Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014); S.S.R. 16-3p at *10. While Plaintiff has suggested an alternative interpretation of the evidence, this is not sufficient to establish reversible error.  See Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679 (citations omitted). Accordingly, the Court finds the ALJ provided clear and convincing reasons supported by substantial evidence for discounting Plaintiff's pain testimony.

**C.      Whether the ALJ Properly Discounted Plaintiff's Mother's Letter**

Plaintiff argues the ALJ improperly rejected Ms. Carvalho's lay testimony solely because of a lack of medical training, and that Ms. Carvalho's observations were relevant and consistent with the medical evidence.  (ECF No. 29-1 at 23–24.)

The Ninth Circuit has held that "[l]ay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  Tobeler v. Colvin, 749 F.3d 830, 832 (9th Cir. 2014) (citations omitted); see also Molina, 674 F.3d at 1111.  In giving "germane reasons" for disregarding a lay witness's testimony, the ALJ "should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  Wilson v. Berryhill, No. 17-cv-05385-PJH, 2018 WL 6421874, at *12 (N.D. Cal. Dec. 6, 2018).  Germane reasons must also be specific.  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009).

Here, the ALJ considered Ms. Carvalho's statements and noted Ms. Carvalho's

description of Plaintiff's activities and symptoms was generally consistent with Plaintiff's own reports. (AR 28–29 (citing AR 335–42).) Next, the ALJ considered Ms. Carvalho's opinions and accorded them "little weight." The ALJ explained that he discounted Ms. Carvalho's statement to the extent she provided opinions as to Plaintiff's functional limitations because Ms. Carvalho is not a medical professional. "[L]ay witness testimony is 'incompetent' when it consists of a medical diagnosis, because 'medical diagnoses are beyond the competence of lay witnesses' to make." Tobeler, 749 F.3d at 833 (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)). Thus, the ALJ provided a germane reason for discounting Ms. Carvalho's opinions as to Plaintiff's functional limitations.

Furthermore, the ALJ also discounted Ms. Carvalho's statements to the extent her observations were contradicted by "the accumulated medical evidence regarding the extent to which [Plaintiff's] limitations [could] reasonably be considered severe" — a reason which Plaintiff does not address in her briefing. Contradictory evidence in the record is also a germane reason for rejecting lay testimony. See Lewis, 236 F.3d at 512. Because Ms. Carvalho's statements regarding Plaintiff's activities and symptoms largely mirrored Plaintiff's testimony, the same reasons previously discussed for discounting Plaintiff's allegations apply here. See Valentine v. Astrue, 574 F.3d 685, 694 (9th Cir. 2009) (ALJ's valid reasons for rejecting claimant's testimony were equally germane to similar lay testimony); Lewis, 236 F.3d at 512 (stating that the ALJ "noted arguably germane reasons for dismissing the [lay] testimony, even if he did not clearly link his determination to those reasons"); see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993) (approving ALJ's dismissal of daughters' lay testimony on basis that they were merely repeating the claimant's statements, where daughters' statements did not explain sufficiently when and to what extent they had the opportunity to observe their mother). Thus, in light of the Court's conclusion that the ALJ provided clear and convincing reasons for rejecting Plaintiff's own subjective complaints, and because Ms. Carvalho's testimony was similar to such complaints, the Court finds the ALJ appropriately re-incorporated his earlier discussion by reference when rejecting Ms. Carvalho's lay witness statement.

Accordingly, the "little weight" the ALJ accorded to Ms. Carvalho's statements and

1   opinions is supported by substantial evidence and was not error.

2         **D.**      **Whether the ALJ Properly Concluded Plaintiff Could Perform Work**
3                    **Existing in Significant Numbers in the National Economy**

4         At Step Five, "the Commissioner has the burden to identify specific jobs existing in

5   substantial numbers in the national economy that [a] claimant can perform despite [his] identified

6   limitations." Zavalin v. Colvin, 778 F.3d 842, 845 (9th Cir. 2015) (citation and internal

7   quotations omitted). There are two ways for the Commissioner to meet his Step Five burden: (1)

8   the testimony of a VE; or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt.

9   404, subpt. P, app. 2. Osenbrock, 240 F.3d at 1162–63 (citing Tackett v. Apfel, 180 F.3d 1094,

10  1100–01 (9th Cir. 1999)). Where the testimony of a VE is used, the VE must identify a specific

11  job or jobs in the national economy having requirements that the claimant's physical and mental

12  abilities and vocational qualifications would satisfy. 20 C.F.R. § 404.1566(b); see Burkhart v.

13  Bowen, 856 F.2d 1335, 1340 n. 3 (9th Cir. 1988). Hypothetical questions posed to the vocational

14  expert must set out all the limitations and restrictions of the particular claimant, as supported by

15  the medical record. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

16        As noted above, the ALJ found Plaintiff has the RFC to perform:

17            light work as defined in 20 CFR 404.1567(b)[24] except the claimant
18            is able to at [sic] unskilled work that is SVP 1 or 2 or could be
              learned on the job in one month or less and would not exceed
19            reasoning level 2; is able to tolerate a low level of work pressure,

---

20  [24] Pursuant to the disability regulations:

21       Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
         weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when
22       it requires a good deal of walking or standing, or when it involves sitting most of the time with some
         pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of
23       light work, you must have the ability to do substantially all of these activities. If someone can do light
         work, we determine that he or she can also do sedentary work, unless there are additional limiting factors
24       such as loss of fine dexterity or inability to sit for long periods of time.

25  20 C.F.R. § 404.1567(b). Sedentary work is defined as follows:

26       Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
         articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which
27       involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.
         Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

28  20 C.F.R. § 404.1567(a).

> defined as work with no multi-tasking or detailed job tasks; is able to work at a consistent pace throughout the workday but not at a production rate pace where each task must be performed within a strict time deadline with no tolerance for discrepancies; is able to tolerate occasional interaction with coworkers and respond appropriately to criticism from supervisors and tolerate occasional interaction with the public; is able to occasionally climb ramps, stairs, balance, stoop, kneel, crouch or crawl but never work around hazards such as moving dangerous machinery or unprotected heights and never climb ladders ropes or scaffolds.

(AR 20.)  The ALJ applied this RFC to his hypothetical to the VE, and relied on the testimony of the VE that Plaintiff could perform the duties of a retail marker, routing clerk, and housekeeper. (Id. at 30.)

First, Plaintiff argues the ALJ failed to set out all of Plaintiff's limitations and restrictions in the hypotheticals he posed to the VE at the June 18, 2018 hearing.  (ECF No. 29-1 at 25.) Namely, Plaintiff argues the hypothetical was incomplete because the ALJ improperly omitted Plaintiff's allegations, the limitations described by Plaintiff's mother, and certain limitations assessed by Plaintiff's treating and examining providers (presumably, those assessed by Dr. Ferrari).  As to this argument, the Court finds Plaintiff is merely rehashing her prior arguments that the ALJ improperly discounted her testimony, her mother's statements, and Dr. Ferrari's opinion.  Because the Court previously found the ALJ provided clear and convincing reasons supported by substantial evidence for discounting Plaintiff's allegations and Dr. Ferrari's opinion, and germane reasons for discounting Ms. Carvalho's statements, Plaintiff's argument on this basis fails.  See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175–76 (9th Cir. 2008) (rejecting a step five argument that "simply restates" arguments about medical evidence and testimony); see also Embrey, 849 F.2d at 423 (acknowledging there is no requirement that testimony for which the ALJ has provided specific and legitimate reasons to discount be included in the hypothetical given the VE).

Second, Plaintiff argues both retail marker and routing clerk are improper jobs based on the limitations the ALJ found.  (AR 24–25.)  More specifically, Plaintiff argues these positions require GED Reasoning Levels of 2, which purportedly does not comport with the ALJ's finding that Plaintiff is only "able to tolerate a low level of work pressure, defined as work with no multi-

41

tasking or detailed job tasks . . ." (Id. at 24 (citing DOT and AR 20) (emphasis added by Plaintiff).)  Plaintiff argues the aforementioned phrase conflicts with the definition of Level 2 jobs and therefore the positions of Retail Marker and Routing Clerk are beyond Plaintiff's capacity.

However, the Court does not see any conflict with the ALJ's RFC.  There are six GED Reasoning Levels that range from Level One (simplest) to Level Six (most complex).  Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1002–03 (9th Cir. 2015) (citing Appendix C - Components of the Definition Trailer, 1991 WL 688702).  The lowest two levels are:

> Level 1: Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
>
> Level 2: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

Id.  The ALJ provided Plaintiff is capable of "unskilled work that is SVP 1 or 2 or could be learned on the job in one month or less and would not exceed reasoning level 2"; thus, the RFC is inclusive of Level 2 work.  There is no indication that the RFC's reference to "no multitasking or detailed job tasks" is equivocal to "one- or two-step instructions."  See Rounds, 807 F.3d at 996 (distinguishing between an RFC for "simple work" and the more limiting RFC for only "1–2 step tasks").  Plaintiff cites to zero legal authority to support her argument that her limitation of being able only to perform simple, repetitive tasks precludes Level 2 work.  Indeed, to the contrary, the Ninth Circuit has held that "simple" or "repetitive" tasks is consistent with Level 2 reasoning.  Id. at 1004 n.6 (collecting cases).

Finally, even if Plaintiff's argument were persuasive, the Court notes Plaintiff only challenges the VE's testimony that she could perform the jobs retail marker and routing clerk; Plaintiff does not, however, appear to take issue with the VE's testimony that she could perform the job of housekeeper.  Accordingly, the ALJ's burden at step five remains satisfied because at least one job existing in the national economy that Plaintiff can perform has been identified.  Therefore, even if the ALJ erred with respect to identifying the jobs retail marker and routing clerk for Plaintiff, any such error was harmless and there is no basis for remand.  See Tommasetti,

533 F.3d at 1038 (harmless error "exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."); Molina, 674 F.3d at 1111 (courts may not reverse an ALJ's decision on account of an error that is harmless); see also Shinseki, 556 U.S. at 409 (claimant has the burden of showing error is harmful).  Accordingly, the Court will not disturb the ALJ's Step Five determinations.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ sufficiently provided clear and convincing reasons for discounting Dr. Ferrari's opinions and Plaintiff's testimony, he sufficiently provided germane reasons for discounting Ms. Carvalho's testimony, and he did not commit error in determining Plaintiff's Residual Functional Capacity or identifying a specific job or jobs in the national economy consistent with Plaintiff's RFC.  As such, the Court finds the ALJ's decision to be supported by substantial evidence in the administrative record, and free from remandable legal error.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Cecilia M. Carvalho (formerly Ferreira).  The Clerk of the Court is DIRECTED to CLOSE this action.

IT IS SO ORDERED.

Dated:   **April 22, 2022**

_____
UNITED STATES MAGISTRATE JUDGE